UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

DORETHA MCCALLUM,                    )
                                     )
              Plaintiff,             )
                                     )
       v.                            )
                                     )      Civil Action No. 21-1911 (ABJ)
ALEJANDRO MAYORKAS,                  )
*Secretary of the U.S. Department*   )
*of Homeland Security*,              )
                                     )
              Defendant.             )
_____  )

## MEMORANDUM OPINION AND ORDER

Plaintiff Doretha McCallum is a Management and Program Analyst ("MPA") at the Department of Homeland Security ("DHS"), and she works in the Office of Partnership and Engagement ("OPE") within Immigration and Customs Enforcement ("ICE"). Compl. [Dkt. # 1] ¶¶ 1–2, 16. She alleges that the agency discriminated against her in violation of Title VII, 42 U.S.C. § 2000e *et seq.*, on the basis of her race and gender, retaliated against her, and subjected her to a hostile work environment. Compl. ¶¶ 5, 140, 148, 158, 162–63. On February 1, 2022, defendant moved to dismiss her complaint under Federal Rule of Civil Procedure 12(b)(6). *See* Def.'s Mot. to Dismiss [Dkt. # 13] ("Def.'s Mot."). Plaintiff opposed the motion, and the matter is now fully briefed. *See* Pl.'s Opp. to Def.'s Mot. [Dkt. # 15] ("Pl.'s Opp."); Reply Mem. in Supp. of Def.'s Mot. [Dkt. # 17] ("Def.'s Reply").

For the reasons set forth below, the Court will **GRANT** defendant's motion to dismiss as to plaintiff's hostile work environment claim. Defendant's motion to dismiss will be **DENIED** with respect to plaintiff's discrimination and retaliation claims related to the reassignment of her

duties, as well as her retaliation claim based on defendant's failure to provide the necessary amount of time for her to meet with her EEO attorney. The Court will otherwise **GRANT** defendant's motion to dismiss plaintiff's remaining discrimination and retaliation claims.

## BACKGROUND

Plaintiff has been employed with DHS in the Washington, D.C. office since January 2010. Compl. ¶¶ 2–3, 16. Throughout this time, she has worked as a Management and Program Analyst ("MPA") in the Office of Partnership and Engagement within ICE. Compl. ¶¶ 1–2, 16. Plaintiff alleges the agency discriminated against her on the basis of her race (African-American) and her gender (female), retaliated against her for engaging in EEO activity, and subjected her to a hostile work environment.[1] Compl. ¶¶ 5, 140, 148, 158, 162–63. Plaintiff's allegations are primarily based on the conduct of two of her supervisors: Deputy Assistant Director ("DAD") Barbara Gonzalez, who was plaintiff's first line supervisor from 2017 to October 2019, and acting DAD Richard Rocha, who was supervising plaintiff by July 2019. *See* Compl. ¶¶ 18–19, 24(f), 49, 61; *see* Ex. 2 to Compl. [Dkt. # 1-2] ("Organization Charts") at 5.

### Restructuring of Plaintiff's Proposed Position

Plaintiff complains of actions beginning in February 2017, when Gonzalez and Rocha proposed organizational charts that "attempt[ed] to restructure and assign the plaintiff a lower grade" while simultaneously "work[ing] hard to ensure that Rocha would be employed in a high grade, high-authority position." Compl. ¶ 24. Plaintiff alleges that Gonzalez and Rocha, both of whom are Hispanic, were "clearly close friends" and had developed a close relationship while working together at the Office of Public Affairs since January 2009. Compl. ¶¶ 18–22. From

---

1    Plaintiff states that her prior 2017 and 2019 EEO cases are "Agency Case No.: HSICE-02569-2017 and Agency Case No.: HS-ICE-001 18-2019, respectively." Compl. ¶ 17.

February 2017 to July 2019, Gonzalez and Rocha allegedly reconfigured a series of proposed organizational charts in a manner that gradually "weaken[ed] McCallum's [proposed] position as Chief of Staff" at a GS-15 pay scale until plaintiff occupied a "lower GS-14 position." Compl. ¶ 24.

In 2017, the original organizational chart for the OPE listed the proposed Chief of Staff position at a "GS-15" pay scale. Compl. ¶ 24(a); Organization Charts at 1. Plaintiff had been serving as an Acting Chief of Staff, and this chart "mark[ed] the beginning of an attempt to create a permanent structure for the office." Compl. ¶ 24(a), (b). Plaintiff "openly desired a GS-15 position for Chief of Staff to be placed on the organizational chart," and at some point spoke with Cory Mayberry, an employee in the Office of the Chief Financial Officer, about this position. Compl. ¶¶ 29–30. Plaintiff alleges that Mayberry told her that "Chiefs of Staff at ICE were GS-15," and that "she was the only non GS-15 Chief of Staff." Compl. ¶ 30. Plaintiff states she "expressed to DAD Gonzalez that . . . it was important that a GS-15 Chief of Staff position be created for her in the org chart," which Gonzalez allegedly disapproved. Compl. ¶ 31. According to plaintiff, in January 2018 Gonzalez stated that "she was 'looking out for [Rocha] and her[self] and that [plaintiff] should apply for other positions with upward mobility because she had so much 'education and experience.'" Compl. ¶¶ 31–32.[2]

Plaintiff alleges that Gonzalez subsequently "demoted plaintiff's [proposed] position while working through 3 org chart iterations to create a DAD position for Rocha." Compl. ¶ 33. On February 27, 2018, Gonzalez proposed a chart designating Rocha as a DAD and listing what was formerly a GS-15 Chief of Staff position as a "GS-15 or GS-14" position that would be subordinate

---

2       Plaintiff does not indicate when this conversation occurred in her complaint. According to plaintiff's February 7, 2020, EEO complaint, this occurred in January 2018. Ex. A to Def.'s Mot. to Dismiss [Dkt. # 13-2] ("DHS Acceptance of Formal Complaint") at 2.

to Rocha.  Compl. ¶ 24(e)(i); Organization Charts at 3.  In March 2018, Gonzalez proposed a new chart removing the "Chief of Staff" title and labeling plaintiff's position as a "MPA/COTR" at the GS-14 level.  Compl. ¶ 24(e)(ii); Organization Charts at 4–5.

In October 2018, plaintiff contacted the Office of the Acting Deputy Director of ICE, Matt Albence, to schedule a meeting to discuss her concerns with the proposed chart's elimination of the Chief of Staff position, and a meeting was scheduled for October 12, 2018.  Compl. ¶ 25. Albence's Special Assistant, Laura Hernandez-Winklemann, a Hispanic woman who plaintiff alleges was friends with Gonzalez, called plaintiff to ask "what the nature of the meeting was." Compl. ¶ 26.  When plaintiff stated that "it was a personal matter," Hernandez-Winklemann allegedly informed plaintiff she should have first contacted Gonzalez, who could "make or break" plaintiff.  Compl. ¶ 26.  Plaintiff states Hernandez-Winklemann then removed the meeting from the calendar.  Compl. ¶ 27.  Gonzalez subsequently raised the chain of command issue in plaintiff's 2018 performance review, stating that "any meetings with agency leadership . . . must be cleared and approved by the acting assistant director."  Compl. ¶ 28.

Plaintiff alleges that Albence approved the proposed March 2018 organizational chart while plaintiff was serving on detail to the United States Citizenship and Immigration Services ("USCIS") from May to August 2019.  Compl. ¶¶ 60, 73–74.  In July 2019, Gonzalez's March 2018 organization chart was codified, designating Rocha as a GS-15 DAD, and plaintiff as a GS-14.  Compl. ¶ 24(f); Organization Charts at 5.  On October 23, 2019, Gonzalez emailed plaintiff "a revised office organizational chart that omitted the [ ] Chief of Staff position."  Compl. ¶ 71.

### Reassignment of Plaintiff's Duties

Plaintiff also complains that "a wide range of [ ] duties [were] removed from her position." Compl. ¶ 51.  First, she alleges that Gonzalez "silo[ed]" her away from Community Resource

Officers ("CROs") with whom she had previously worked with as a Contracting Officer Representative ("COR").   Compl. ¶¶ 38–41, 53.   As of July 2018, if she mentioned any conversations that she had with CROs to Gonzalez, Gonzalez would ask why they were calling plaintiff and instruct her that "[t]his [was] not in [her] lane."  Compl. ¶ 40.  Gonzalez also informed plaintiff she would be an unofficial rather than official supervisor for a newly created Mission Support Specialist position, and plaintiff posits that this occurred because "placing plaintiff in an officially supervisory position would appear to be a challenge to" the careers of her supervisors, including Gonzalez.  Compl. ¶¶ 89–90.  Plaintiff further alleges that after the elimination of the proposed Chief of Staff position, a number of her duties were reassigned to Rocha and his successor, including:  representing the OPE at the weekly Chief of Staff meetings in the Director's Office, attending periodic meetings, executing the furlough process, managing onboarding processes, and "be[ing] available in the office for questions concerning staff, Human Resources, and resource allocation."  Compl. ¶ 78.

<u>**Alleged Discriminatory and Retaliatory Conduct in October and November 2019**</u>

In addition to the claims involving eliminating the desired GS-15 Chief of Staff position and diminishing plaintiff's responsibilities and duties, plaintiff alleges that her supervisors took a number of other adverse actions against her:

- On October 16, 2019, Gonzalez requested that plaintiff leave a conference call with a vendor "because it was not 'administrative' in nature."  Compl. ¶ 52.

- In late October 2019, plaintiff was not invited to assist with the "DHS Day" conference in Washington D.C., and Gonzalez allegedly chose a lesser experienced, white employee to attend the event.  Compl. ¶¶ 84, 86–88.

- In late October 2019, plaintiff served on a hiring panel with Rocha and another coworker.  Compl. ¶ 91.  Plaintiff's top choice, an African American woman named Tabatha Burley, was not selected, and Rocha "said something to the effect of wanting to hire anyone but Burley."  Compl. ¶ 91(d).

- On October 29, 2019, plaintiff was not invited to attend a congressional briefing concerning the budget and mission of the OPE with Gonzalez, acting DAD Elizabeth Nicholson, and the same contractor who attended the "DHS Day" conference.  Compl. ¶¶ 59, 96.  Plaintiff alleges that Gonzalez and Nicholson offered conflicting testimony as to why she was not included.  Compl. ¶¶ 98–99.

### Non-Selection and Failure to Advertise Supervisory Community Relations Officer and Acting DAD Position

The complaint also contains allegations that the failure to select plaintiff to fill a new supervisory position and the process used in selecting the person who filled this position were discriminatory.  Compl. ¶ 107.

On October 21, 2019, plaintiff learned that Nicholson had replaced DAD Rocha "unofficially" as the acting DAD – and as plaintiff's supervisor – while plaintiff was on her DHS detail.  Compl. ¶¶ 59, 61, 64.  Nicholson previously worked as a GS-13 CRO in Tampa, Florida, and was "promoted as a Supervisory Community Relations Officer (GS-14) but was given the title of acting DAD."  Compl. ¶¶ 62, 67, 102.  Plaintiff contends the promotion was inappropriate because the position was "only advertised by a single email" that Rocha sent while plaintiff was on detail and had limited access to the email account.  Compl. ¶¶ 104–105.  At least four individuals applied to the position in response to Rocha's email, but plaintiff does not allege that she applied.  Compl. ¶¶ 102–108.[3]  The agency never posted the position on USA Jobs nor conducted interviews for this position.  Compl. ¶ 102(d).  On October 30, 2019, plaintiff asked "why she was not selected for [this] acting DAD position."  Compl. ¶ 102.  Plaintiff alleges that the selection was discriminatory in nature because Nicholson had less experience than her at DHS, did not have any management experience, and was based in Florida.  Compl. ¶¶ 102–103, 107.

---

[3]     Plaintiff states that three of these individuals are also part of an EEO action alleging discrimination in relation to this process.  Compl. ¶ 108.

Plaintiff further contends that because DHS policy requires that "temporary positions must become competitive after 120 days via a posting on USA Jobs," the acting DAD position should have been posted on USA Jobs in December 2019, 120 days after Nicholson's "'temporary' promotion to DAD." Compl. ¶¶ 66, 120–21.

### Actions Taken After Plaintiff's EEO Activity

On November 4, 2019, plaintiff first contacted the agency's EEO Counselor in connection with the claims related to this case. Compl. ¶ 8.[4] Plaintiff alleges that she continued to face discrimination after contacting the EEO Counselor:

- Since November 2019, Gonzalez "has undermined [plaintiff's] ability to perform her budget related duties." Compl. ¶ 109. For example, Gonzalez worked with others to draft the "RAP22 budget form" and only sent it to plaintiff for finalization. Compl. ¶¶ 111–13. Plaintiff also states Gonzalez was nonresponsive to her requests for 2019 budget information for budget formulation purposes. Compl. ¶¶ 115–19.

- On February 21, 2020, Gonzalez emailed plaintiff about a payroll policy with others on the chain, stating, "Were you informed of this? Please advise." Compl. ¶¶ 128–29. Plaintiff alleges this was an "unnecessary public scolding" and "part of a larger pattern of harassment, discrimination, and attempts to publicly minimize" her. Compl. ¶¶ 129–30.

- On March 12, 2020, plaintiff learned that Gonzalez was reassigning some of her contractual duties to Nicholson, "[c]ontinuing the pattern of reassignment and removal of plaintiff's non-administrative (budgetary and contracting) duties to favored white employees." Compl. ¶ 126.

- In March 2020, plaintiff received negative feedback and comments from Gonzalez in her mid-year review. Compl. ¶ 131. These included requests that plaintiff provide OPE leadership with "written after-action emails" and daily reports. Compl. ¶ 132(a), (b). Plaintiff alleges that such tasks are not "commensurate with [her] duties and that she should be trusted to complete her work without constant update," which other "similarly situated employees" were not required to do. Compl. ¶ 132(b)(i). Plaintiff further alleges she was "reminded that her telework agreement is for one day a week and that repairs to her home and other matters are no reasons for additional telework days," which reflected discrimination because "non-Black, favorite employees such as Rocha had been teleworking every day

---

4    Plaintiff states that she engaged in prior EEO activity in 2017 and 2019. Compl. ¶ 17.

with no accountability for years" even though they were "officially listed as in person employees." Compl. ¶ 132(c).

- On March 8, 2021, plaintiff emailed Gonzalez requesting authorization to work as a COR on a contract for which a partner office specifically requested plaintiff. Compl. ¶ 55. Plaintiff alleges Gonzalez delayed responding to plaintiff's time sensitive email for over a month, despite repeated reminders from plaintiff and the partner. Compl. ¶ 55.

**Plaintiff's Equal Opportunity Advocacy**

On January 22, 2020, the agency notified plaintiff that the EEO counseling had concluded, and she had a right to file a formal complaint. Compl. ¶ 9. On January 29, 2020, plaintiff requested eight hours of administrative leave "to conference with an attorney concerning her EEO complaint." Compl. ¶ 122. Gonzalez allegedly only granted plaintiff 1.5 hours of leave, so plaintiff had to use eight hours of her annual leave. Compl. ¶¶ 123–24. Plaintiff alleges that 90 minutes did not afford enough time to "gather resources, travel to an attorney, meet with the attorney, and travel back." Compl. ¶ 125.

On January 31, 2020, plaintiff filed a formal administrative complaint "alleging discrimination based on race, gender, and retaliation." Compl ¶ 10. The agency accepted and referred plaintiff's claims from January 2018 through October 30, 2019 for investigation into "[w]hether the Agency subjected [plaintiff] to a hostile work environment, based on race (African American), [and] sex (female gender identity)." Ex. A to Def.'s Mot. to Dismiss [Dkt. # 13-2] ("DHS Acceptance of Formal Complaint") at 1. On April 9, 2020, plaintiff moved to amend her complaint to include additional claims of a hostile work environment from November 2019 to March 13, 2020, and a new reprisal claim, which the agency accepted. Ex. B to Def.'s Mot. to Dismiss [Dkt. # 13-3] ("DHS Amended Acceptance of Formal Complaint") at 1–2. On April 21, 2021, DHS released its final agency decision, denying all of plaintiff's claims. Ex. D to Def.'s Mot. to Dismiss [Dkt. # 13-5] ("Final Agency Decision") at 14.

**The Complaint**

On July 15, 2021, plaintiff filed a complaint consisting of four counts.  Compl. ¶¶ 136–74.

In Count I, plaintiff contends that through the adverse actions detailed above, the agency "engaged in race-based discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq*."  Compl. ¶ 140.[5]  Plaintiff argues "similarly situated co-workers outside of [her] race" were not treated comparably, identifying Richard Rocha, Elizabeth Nicholson, and Jessica Molina as those receiving preferential treatment.   Compl. ¶ 138.   In contrast, plaintiff alleges she received "disparate and unfair treatment" on the basis of her race for which she suffered "lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress."  Compl. ¶¶ 138, 141.

Count II alleges that the "[a]gency engaged in gender-based discrimination in violation of Title VII" because plaintiff's "supervisor did not support the advancement of the specific demographic of African American women."  Compl. ¶¶ 143, 148.  Plaintiff alleges that the same three "similarly situated co-workers outside of [her] gender-race combination" received "preferential treatment,"  while she  "received disparate and unfair treatment on the basis of [her] gender-race combination" and suffered "lost income, benefits, and the opportunity for future promotions and employment, as well as mental and emotional distress."  Compl. ¶¶ 144–46, 149.

---

5       Plaintiff writes in the complaint that the agency engaged in "race-based discrimination in violation of Title VII, 42 U.S.C. § 2000e *et seq*. and 29 U.S.C. § 633a."  Compl. ¶ 140.  This provision, which is mentioned alongside Title VII throughout the complaint, *see* Compl. ¶¶ 5, 140, 148, 158, 162–63, 172, prohibits discrimination on account of age in federal government employment.   But plaintiff's complaint does not include any facts or claims regarding age discrimination, and neither party's brief mentions section 633a or age discrimination.   Therefore, the Court will construe the complaint charging discrimination based on plaintiff's race and gender, retaliation, and a hostile work environment as alleging violations of Title VII only.

In Count III, plaintiff alleges that the "[a]gency engaged in retaliation in violation of Title VII" after plaintiff "engaged in protected activity when she complained about discrimination, filed with the EEO Counselor and filed her EEO formal complaint and amendments." Compl. ¶¶ 151, 158. Plaintiff alleges that the adverse actions that followed "were because of [her] protected activity." Compl. ¶ 152. She adds that her "protected EEO activity was a motivating factor" for how she was treated, Compl. ¶ 152–53, and she distinguishes herself from similarly situated co-workers who did not complain about discrimination. Compl. ¶ 154. Plaintiff contends that the agency's actions "would have discouraged a reasonable person in [p]laintiff's position not to engage in protected activity." Compl. ¶ 155.

Count V alleges that the agency subjected plaintiff to a hostile work environment based on her "gender and race" and "retaliation" in violation of Title VII. Compl. ¶¶ 163, 172. [6] Plaintiff alleges that the hostile work environment "materially altered [her] working conditions," Compl. ¶ 171, as the "[d]efendant's harassment" was "unwelcome," "objectively and subjectively hostile," and "severe and pervasive," Compl. ¶¶ 165–67, and caused her to suffer "economic losses, emotional distress, humiliation, shame, and embarrassment." Compl. ¶ 174.

## STANDARD OF REVIEW

"To survive a [Rule 12(b)(6)] motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009), quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). In *Iqbal*, the Supreme Court reiterated the two principles underlying its decision in *Twombly*: "First, the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable

---

[6]     Plaintiff denotes the final count as "Count V" rather than "Count IV," Compl. ¶¶ 160–174, but there are only four counts.

to legal conclusions," and "[s]econd, only a complaint that states a plausible claim for relief survives a motion to dismiss." *Id.* at 678–79, citing *Twombly*, 550 U.S. at 555–56.

A claim is facially plausible when the pleaded factual content "allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* at 678, citing *Twombly*, 550 U.S. at 556. "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.*, quoting *Twombly*, 550 U.S. at 556. A pleading must offer more than "labels and conclusions" or "a formulaic recitation of the elements of a cause of action," *id.*, quoting *Twombly*, 550 U.S. at 555, and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*, citing *Twombly*, 550 U.S. at 555.

When considering a motion to dismiss under Rule 12(b)(6), the Court is bound to construe a complaint liberally in the plaintiff's favor, and it should grant the plaintiff "the benefit of all inferences that can be derived from the facts alleged." *Kowal v. MCI Commc'ns Corp.*, 16 F.3d 1271, 1276 (D.C. Cir. 1994), citing *Schuler v. United States*, 617 F.2d 605, 608 (D.C. Cir. 1979). Nevertheless, the Court need not accept inferences drawn by the plaintiff if those inferences are unsupported by facts alleged in the complaint, nor must the Court accept plaintiff's legal conclusions. *See id.*; *see also Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002). In ruling upon a motion to dismiss for failure to state a claim, a court may ordinarily consider only "the facts alleged in the complaint, documents attached as exhibits or incorporated by reference in the complaint, and matters about which the Court may take judicial notice." *Gustave-Schmidt v. Chao*, 226 F. Supp. 2d 191, 196 (D.D.C. 2002), citing *E.E.O.C. v. St. Francis Xavier Parochial Sch.*, 117 F.3d 621, 624–25 (D.C. Cir. 1997).

**ANALYSIS**

Plaintiff claims defendant discriminated against her on the basis of her race and gender in connection with the elimination of the Chief of Staff position she had proposed, the failure to promote her to or advertise the new supervisory position, the negative performance review, the reassignment of her responsibilities, and several other incidents.  She further alleges that defendant retaliated against her after she complained about discrimination and engaged in protected EEO activity.  Pointing to all of these actions, plaintiff also claims defendant subjected her to a hostile work environment.

After close consideration of the parties' submissions, the Court finds that plaintiff has failed to exhaust her administrative remedies with respect to some of her discrimination claims, while others do not rise to the level of actionable adverse actions.  Plaintiff's discrimination and retaliation claims related to the reassignment of her duties, as well as her retaliation claim based on defendant's failure to provide the necessary time for her to meet with her EEO attorney, survive defendant's motion to dismiss.  Finally, while plaintiff might have suffered discrete instances of discrimination or retaliation, these allegations do not support a hostile work environment claim.

I.    **Some of plaintiff's race and gender discrimination claims in Counts I and II survive.**

A.  **The exhaustion issue**

Defendant first argues that any alleged discriminatory acts that occurred before September 20, 2019 – 45 days before plaintiff contacted an EEO counselor – as well as any claims not raised in plaintiff's formal EEO complaint should be dismissed for failure to exhaust administrative

remedies.[7]  Title VII requires that before filing a lawsuit in federal court, a plaintiff must timely

pursue and exhaust administrative remedies.  *Hamilton v. Geithner,* 666 F.3d 1344, 1349 (D.C.

Cir. 2012); *Washington v. Wash. Metro. Area Transit Auth.,* 160 F.3d 750, 752 (D.C. Cir.

1998); *see also Bowden v. United States,* 106 F.3d 433, 437 (D.C. Cir. 1997).  To timely exhaust

administrative remedies, an employee must consult an agency EEO Counselor within 45 days of

the alleged discriminatory event, 29 C.F.R. § 1614.105, and must file a formal complaint within

180 days of the alleged discriminatory event.  *See generally* 42 U.S.C. § 2000e–16; 29 C.F.R.

§ 1614.106(a).  Under Title VII, failure to exhaust is not a jurisdictional bar, but rather, it is an

affirmative defense that the defendant bears the burden of pleading and proving.  *See Bowden v.*

*United States*, 106 F.3d at 437.

Defendant moves to dismiss those allegations that were not individually exhausted, citing

*Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 114–15 (2002).  Def.'s Mot. at 13–14 ("each

discrete alleged discriminatory act must be administratively exhausted.").  Plaintiff argues in

response that "[a]ll of the adverse and discriminatory actions going back to 2017 are connected"

because they are "reasonably related" to the allegations of the filed charge, and thus, under the

"continuing violation theory," they are not time barred.  Pl.'s Opp. at 5, 7.

---

7       Plaintiff's original and amended EEO complaints allege only retaliation and hostile work
environment claims, without separate discrimination claims.  *See* DHS Amended Acceptance of
Formal Complaint at 1–2.  Nonetheless, the agency assessed plaintiff's claims under all three
theories.  Final Agency Decision at 5–14.  Defendant does not argue that plaintiff's discrimination
claims should not be addressed by this Court, and the Court will proceed by addressing any claims
plaintiff raised in her EEO complaint as timely exhausted allegations of discrimination, retaliation,
and hostile work environment.  *See Bain v. Off. of Att'y Gen.*, 2022 WL 17904236, at *16 (D.D.C.
Dec. 23, 2022) ("[A] federal employee is not forever bound by the precise manner in which she
framed her administrative complaint, so long as the relevant facts and the nature of the asserted
discrimination is reasonably evident to those involved in the administrative process."); *see also*
*President v. Vance*, 627 F.2d 353, 362 (D.C. Cir. 1980) ("Title VII's exhaustion requirement
should not be read to create useless procedural technicalities.").

The Court construes this argument as an attempt to claim a continuing violation under *Park v. Howard Univ.*, 71 F.3d 904 (D.C. Cir. 1995), but it is unclear whether that doctrine has survived the Supreme Court's decision in *Morgan* for discrimination claims.  A majority of courts in this district have concluded that *Morgan* overruled the *Park* "like or reasonably related" rule, and that therefore every discrete claim of discrimination must be administratively exhausted. [8]  *See Rashad v. Wash. Metro. Area Transit. Auth.*, 945 F. Supp. 2d 152, 165–66 (D.D.C. 2013) (collecting cases that hold that plaintiffs "must exhaust the administrative process regardless of any relationship that may exist between those discrete claims and any others").  Other courts have found that *Morgan* did not overrule *Park*, and that a plaintiff may still bring unexhausted claims of discrimination when the claims are "of a like kind to the [ ] acts alleged in the EEOC charge, which were specified to be of an ongoing and continuing nature." *Smith–Thompson v. Dist. of Columbia*, 657 F. Supp. 2d 123, 136–38 (D.D.C. 2009), citing *Wedow v. City of Kansas City, Mo.*, 442 F.3d 661, 673 (8th Cir. 2006).

Whether the *Morgan* test applies, though, may depend on whether the unexhausted discriminatory events took place before plaintiff contacted the EEO or after she filed her administrative complaint.  The Court agrees with the district court's reasoning in *Mount v. Johnson,* 36 F. Supp. 3d 74, 83–90 (D.D.C. 2014), that "*Morgan* dealt specifically with a factual scenario involving allegations of discrete discriminatory acts that had occurred *before* the plaintiff filed an administrative complaint, and the Supreme Court did not address exhaustion in the context of discriminatory or retaliatory incidents that occurred *after* an administrative complaint is filed," and it will analyze the claims accordingly.  Given the lack of clarity as to whether the holding of

---

[8]     This test does not apply to hostile work environment claims, which the Court addresses separately in Section III.

*Morgan* bars the use of the *Park* test for allegations that arise *after* plaintiff's EEO contact, the Court will analyze them separately.

### i. Discrimination claims occurring before plaintiff contacted the EEO officer on September 20, 2019

*Morgan* requires the Court to find that "discrete discriminatory acts [occurring before the filing of the administrative complaint] are not actionable if time barred, even when they are related to acts alleged in timely filed charges." 536 U.S. at 113. Count I is predicated, in part, on several events that took place before plaintiff first contacted the EEO office on September 20, 2019, including: (1) in January 2018, Gonzalez told plaintiff that she should "apply for other positions with upward mobility because she had so much 'education and experience,'" Compl. ¶ 32; DHS Acceptance of Formal Complaint at 2; (2) from February 2017 to July 2019, Gonzalez and Rocha reconfigured proposed organizational charges to remove plaintiff's proposed Chief of Staff position from the plan, Compl. ¶ 24; (3) since July 2018, Gonzalez "silo[ed]" plaintiff away from communicating with CROs, Compl. ¶¶ 39, 40; (4) in October 2018, plaintiff's meeting with Albence was canceled, Compl. ¶¶ 25, 27; and (5) plaintiff received a negative 2018 performance review for contacting Albence's office, Compl. ¶ 28. Plaintiff did not consult an agency EEO counselor within 45 days of any these alleged discriminatory events and file a formal complaint within 180 days, and therefore, the Court finds that she failed to exhaust her administrative remedies in a timely fashion, with two exceptions.

Although they were not raised with the agency in a timely fashion, plaintiff included two of the claims from 2018 in her complaint, and the agency accepted and analyzed them anyway. The agency's statement of claims accepted for investigation included:

1. Beginning in January 2018, the Deputy Assistant Director (DAD) told Complainant that based on her education and experience she could find a position anywhere, and she was going to look out for herself and the Senior Advisor (SA).

2. From July 2018 to present, Complainant has not been allowed to communicate with her co-workers.

Final Agency Decision at 2.

"Although agencies do not waive a defense of untimely exhaustion merely by accepting and investigating a discrimination complaint, [the D.C. Circuit has] suggested that if they not only accept and investigate a complaint, but also decide it on the merits—all without mentioning timeliness—their failure to raise the issue in the administrative process may lead to waiver of the defense when the complainant files suit." *Bowden v. United States*, 106 F.3d 433, 438 (D.C. Cir. 1997) (internal citations omitted). This approach makes sense given that one goal of administrative exhaustion is to give the agency an opportunity to resolve the issue informally. *See Loe v. Heckler*, 768 F.2d 409, 418 (D.C. Cir. 1985). As the agency has already considered these two allegations on the merits without raising timeliness issues, the Court will consider them on the merits here.

### ii. Discrimination claim after plaintiff filed her amended EEO complaint on April 7, 2020

Plaintiff alleges that on March 8, 2021 – almost a year after she filed her amended EEO complaint – Gonzalez delayed responding to requests that she work as a COR after a partner office requested that she work on a particular contract, despite "repeated reminders from [the partner office] and plaintiff that approving plaintiff was time sensitive." Compl. ¶ 55. The D.C. Circuit has not yet clarified whether *Morgan* or *Park* applies to claims that occurred after the filing of an administrative complaint, but it has made clear that "for a charge to be regarded as 'reasonably related' to a filed charge . . . it must '[a]t a minimum . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination,'" as "[t]his connection is necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'" *Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir.

16

2010), quoting *Park v. Howard Univ.*, 71 F.3d 904, 907 (D.C. Cir. 1995).  Ultimately, the Court

need not decide which standard applies because this claim fails both tests.  This allegation arose

well after, and therefore was not included in, the amended EEO complaint, and more importantly,

plaintiff has failed to show that the claim would be "reasonably related" to any of her filed charges.

The March 2021 incident related to a distinct contract with a particular partner office that requested

to work with plaintiff.  This separate incident is not something that could have been reasonably

expected to arise in an administrative investigation into the claims raised in plaintiff's EEO

complaint filed a year before.

### B.   Only two of plaintiff's allegations rise to the level of adverse employment actions, and only one of those will move forward.

At the motion to dismiss stage, "the plaintiff must establish that (1) she is a member of a

protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action

gives rise to an inference of discrimination."  *Chappell-Johnson v. Powell*, 440 F.3d 484, 488

(D.C. Cir. 2006) (internal citations omitted).  Because the motion is decided based on the face of

the complaint, "an employment discrimination plaintiff need not anticipate legitimate, non-

discriminatory reasons that may be proffered by the employer for the adverse employment action

nor allege pretext to survive a motion to dismiss."  *Easaw v. Newport*, 253 F. Supp. 3d 22, 26–27

(D.D.C. 2017).  Plaintiff need only allege facts supporting an inference that she "suffered an

adverse employment action . . . because of [her protected status]."  *Baloch v. Kempthorne*,

550 F.3d 1191, 1196 (D.C. Cir. 2008).

It is undisputed that plaintiff belongs to two protected classes, so that element has been

alleged as to both Counts I and II.  But setting aside plaintiff's non-selection for the acting DAD

position, defendant argues that none of the other complained-of events rise to the level of the

adverse employment action needed for a discrimination claim.  Def.'s Mot. at 15.

An adverse employment action is a "a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." *Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 761 (1998).   To establish an adverse employment action, a plaintiff must show that she "experience[d] materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 306 F.3d 1127, 1131 (D.C. Cir. 2002).   Plaintiff must, "in most cases," show "direct economic harm," *Burlington Indus.*, 524 U.S. at 762, affecting, for instance, her grade or salary. *Taylor v. Small*, 350 F.3d 1286, 1293 (D.C. Cir. 2003). [9]

---

[9]      In *Chambers v. Dist. Of Columbia*, 35 F.4th 870, 872 (D.C. Cir. 2022), the D.C. Circuit reversed its prior decision in *Brown v. Brody,* 199 F.3d 446, 457 (D.C. Cir. 1999), that "the denial or forced acceptance of a job transfer is actionable under Title VII . . . only if the employee suffered 'objectively tangible harm,'" and set out a clear rule that "an employer that transfers an employee or denies an employee's transfer request because of the employee's race, color, religion, sex, or national origin violates Title VII by discriminating against the employee with respect to the terms, conditions, or privileges of employment." *Chambers*, 35 F.4th at 872. While the holding appears to be limited by its terms to cases involving transfers, the Court of Appeals also expressed more general concerns about the use of the "objectively tangible harm" language that is not found in the statute. *See id.*, at 878 ("[T]he atextual requirement of 'objectively tangible harm' frustrates Title VII's purpose of ending discrimination in the workplace"), *and id.* at 879–80 ("The plain text of section 703(a)(1) contains no requirement that an employee alleging discrimination in the terms or conditions of employment make a separate showing of 'objectively tangible harm.'").   As the dissenting opinion in *Chambers* predicted, *see id.* at 887 (Katsas, J., dissenting), some courts have determined that the *Chambers* opinion has broader application. *See, e.g., Bain v. Off. of Att'y Gen.*, No. 21-cv-1751 (RDM), 2022 WL 17904236, at *18 (D.D.C. Dec. 23, 2022) ("Until recently, plaintiffs in this circuit were required to allege that they had suffered 'objectively tangible harm' in order to plead an adverse action . . . Earlier this year, the en banc D.C. Circuit dispensed with this limitation on Title VII claims . . . *Chambers* held that under Title VII, a plaintiff need not allege that she suffered an 'objectively tangible harm' in order to state a claim; rather, the statutory text requires only discrimination with respect to an employee's 'terms, conditions, or privileges of employment'—no more and no less.").

Based on its review of each allegation, the Court finds that the allegations concerning the reassignment or diminution of plaintiff's responsibilities are sufficient to move forward. The non-selection for a supervisory position also satisfies the element of adversity, but that claim fails for other reasons, and the other alleged adverse actions in Counts I and II do not state actionable claims.[10]

### 1. The elimination of the proposed Chief of Staff position

Plaintiff contends that the elimination of the Chief of Staff position she had proposed was discriminatory. Compl. ¶ 71. Pointing to the organizational charts attached to plaintiff's complaint, defendant argues that plaintiff "appears to concede that there was never a permanent Chief of Staff position" since the agency restructured the Office of Partnership and Engagement. Def.'s Mot. at 7. Moreover, to the extent plaintiff argues that the failure to create a position that had been under consideration constitutes a failure to promote, Pl.'s Opp. at 6–7, her claim fails.

To state a prima facie case of discriminatory refusal to promote, plaintiff must "show that she sought and was denied a promotion for which she was qualified, and that 'other employees of similar qualifications . . . were indeed promoted at the time the plaintiff's request for promotion was denied.'" *Taylor*, 350 F.3d at 1294, citing *Bundy v. Jackson*, 641 F.2d 934, 951 (D.C. Cir. 1981). Here, plaintiff cannot show that any other employee was promoted to the proposed Chief of Staff position. Rather, the position was proposed and then eliminated before anyone was

---

10      This ruling would not change even if the Court agreed that the *Chambers* decision applied to factual situations other than lateral transfers.

selected when OPE's organizational structure was revised.[11]   The elimination of a proposed position that never became permanent cannot form the basis of a failure to promote claim.

### 2.  Non-selection for the position of Supervisory Community Relations Officer

Plaintiff next asserts that defendant's failure to advertise the Supervisory Community Relations Officer position and its selection of someone else to fill the position were discriminatory.[12]   Compl. ¶¶ 102, 104, 107, 120–121. Defendant acknowledges that a failure to promote is an adverse action but argues that this claim fails because plaintiff never applied for the position.   Def.'s Mot. at 15–16.   Plaintiff responds that her application would have been futile "[b]ecause DAD Gonzalez maintained a process of installing hand-picked individuals into positions."   Pl.'s Opp. at 11.

---

11      Plaintiff's failure to promote claim would also fail as related to any failure to promote her to the GS-15 pay grade.   Plaintiff concedes that the last organizational chart attached to her complaint reflects the final version.   Compl. ¶ 24(f).   This chart shows that Gonzalez held the only GS-15 position, while Rocha and plaintiff both held GS-14 positions, meaning other employees were not promoted over her to a GS-15 position.   *See* Organization Charts at 5.

12      While plaintiff refers to the open position as the "acting DAD position," she states, "[t]o be clear, Nicholson was promoted as a Supervisory Community Relations Officer (GS-14) but was given the title of acting DAD and given supervisory authority over plaintiff as if she was a DAD." Compl. ¶ 102.   Plaintiff's non-promotion argument here appears to focus on her non-selection to the position advertised in Rocha's email for which Nicholson was selected.   Compl. ¶¶ 102, 104. To the extent she alleges DHS policy required that defendant create a job posting on USA Jobs 120 days after Nicholson's "'temporary' promotion to DAD," Compl. ¶ 121, plaintiff has not demonstrated that Nicholson continued serving as acting DAD and that this position continued to exist to require such a posting.   Plaintiff concedes that "[i]t is possible that this posting never occurred because, as mentioned before, the DAD position Nicholson held technically did not even exist for someone to be promoted to."   Compl. ¶ 121.   Finally, plaintiff alleges that Gonzalez told her Nicholson was "unofficially" the acting DAD, so she concedes that this was not even a formal position.   Compl. ¶ 64.   The Court will thus address the plaintiff's alleged failure to promote claim with regard to the original position for which defendant advertised over email and promoted Nicholson – that of Supervisory Community Relations Officer.

To establish a prima facie case of discriminatory non-promotion, plaintiff must show that "(1) [she] is a member of a protected class; (2) [she] applied for and was qualified for an available position; (3) despite [her] qualifications [she] was rejected; and (4) either someone . . . filled the position or the position remained vacant and the employer continued to seek applicants." *Lathram v. Snow*, 336 F.3d 1085, 1088 (D.C. Cir. 2003), citing *Cones v. Shalala*, 199 F.3d 512, 516 (D.C. Cir. 2000).  The Court agrees with defendant that plaintiff fails to satisfy this test because she never applied for the position.  As plaintiff admits, while the position was advertised in an email when she "had limited access to [her] email account," Compl. ¶¶ 104–105, she did receive it, and she never applied.  Pl.'s Opp. at 10.

Although there can be exception to this requirement when such an application would have been futile, *Lathram*, 336 F.3d at 1089, citing *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365–66 (1977), the complaint does not contain any facts to support a plausible inference that applying would have been futile.  To prove futility, plaintiff must show that "(1) her employers' policy of 'gross and pervasive' discrimination communicated to a protected class the futility of applying, and (2) that she 'would have applied for the job had it not been for those practices.'" *Carroll v. England*, 321 F. Supp. 2d 58, 67–68 (D.D.C. 2004), citing *Int'l Bhd. of Teamsters*, 431 U.S. at 367–69.  This is a high threshold, intended to reach "the most invidious effects of employment discrimination" and ensure that victims are not denied relief "because the unlawful practices had been so successful as totally to deter job applications from members of minority groups." *Int'l Bhd. of Teamsters*, 431 U.S. at 367.

The complaint is devoid of facts that would show "gross and pervasive" discrimination against either African American or female employees.  Counts I and II state summarily that plaintiff and Tabatha Burley, "both African American [women], received disparate and unfair

treatment on the basis of their race" (Count I) and their "gender-race combination" (Count II), but beyond her own travails and the failure to hire Burley, plaintiff does not allege any specific instances of pervasive discrimination against other African American or women employees or point to any statements or conduct that reveal the presence of discriminatory animus.  Compl. ¶¶ 138(b), 146.  Indeed, the allegation that three other individuals alleging discrimination applied for the position, Compl. ¶ 108, tends to show that the alleged discriminatory practices were not "so successful as totally to deter job applications from members of minority groups."  *Int'l Bhd. of Teamsters*, 431 U.S. at 367.

This fact also defeats plaintiff's argument that defendant "obfuscated the position and blocked [p]laintiff from properly applying."  Pl.'s Opp. at 10.  A plaintiff's failure to apply for a position can be excused if the employer "filled the position without soliciting applications." *Carroll*, 321 F. Supp. at 68.  But plaintiff concedes that "the position was advertised in one email," Pl.'s Opp. at 10; Compl. ¶ 104, and she asserts that Nicholson and three others "sent in 'applications' in response to Rocha's email." Compl. ¶ 108. Thus, even if one accepts the complaint as true and resolves any inferences in plaintiff's favor, there is nothing to suggest that the availability of the position was "obfuscated" or that this case falls within the limited set of situations when a failure to apply can be excused on the grounds that it would have been futile. For these reasons, the non-selection for the Supervisory Community Relations Officer position is not an actionable adverse action.

### 3.  Negative performance reviews

Plaintiff contends that the negative feedback and comments she received in her March 2020 mid-year review were discriminatory.  Compl. ¶ 131.  "[P]erformance evaluations ordinarily are not actionable under Title VII" when they "do not obviously result in a significant change in

employment status." *Douglas v. Donovan*, 559 F.3d 549, 552–53 (D.C. Cir. 2009); *see also Taylor*, 350 F.3d at 1293 ("[F]ormal criticism or poor performance evaluations are [not] necessarily adverse actions and they should not be considered such if they did not affect[ ] the [employee's] grade or salary.") (internal quotation marks and citations omitted).  Plaintiff does not allege anywhere in her complaint that her 2020 mid-year review affected her grade or salary. Rather, plaintiff alleges that she was given new tasks and reminded of defendant's telework policy. Compl. ¶ 132.  Since the mid-cycle review did not cause any "significant change in employment status," *Douglas*, 559 F.3d at 552, and because it did not "affect the terms, conditions, or privileges of employment," *Chambers*, 35 F.4th at 876, it was not an adverse employment action.[13]

### 4.  Reassignment of plaintiff's responsibilities

Plaintiff alleges that a wide range of her budgetary, contracting, and supervisory duties were removed and reassigned.  Compl. ¶¶ 38–41, 51, 53, 78, 90, 126.  "[R]eassignment with significantly different responsibilities" can establish an adverse employment action, *Burlington Indus.*, 524 U.S. at 761, as can "[w]ithdrawing an employee's supervisory duties." *Czekalski v. Peters*, 475 F.3d 360, 364 (D.C. Cir. 2007); *see also Burke v. Gould*, 286 F.3d 513, 522 (D.C. Cir. 2002) (holding there was "no doubt that the removal of [plaintiff's] supervisory responsibilities constituted an adverse employment action); *see also Baloch v. Norton*, 355 F. Supp. 2d 246, 258 (D.D.C. 2005) (citing instances where circuit courts have held a plaintiff's job responsibilities significantly changed, such as a "deskilling" of her position or "correspondent increase in qualitatively inferior work").

---

13    Similarly, even if plaintiff's claim that her 2018 negative performance review was discriminatory had been exhausted in a timely fashion, it would have also failed because it did not cause a significant change in employment status.

Construing the complaint in favor of plaintiff as the Court is required to do at this time, plaintiff's allegations give rise to a plausible inference of reassignment with significantly different responsibilities. She alleges that defendant has eroded her budgetary and contracting duties over time and re-assigned her contracting duties to Nicholson. Compl. ¶ 126. Nicholson and Rocha took on many of her duties, including executing the furlough process. Compl. ¶ 78. Notably, plaintiff alleges that she has been "silo[ed]" from communicating with her coworkers and Community Resource Officers that she previously supervised as a Contracting Officer Representative, losing supervisory responsibilities she held for at least two years. Compl. ¶¶ 38–41, 51, 53. The Court therefore finds that plaintiff has sufficiently alleged that she suffered an adverse employment action because of her protected status and denies the motion to dismiss Counts I and II insofar as those claims are based on the reassignment of plaintiff's work responsibilities.

### 5.   Remaining employment actions

Plaintiff's remaining claims allege discrimination based on various incidents, including: (1) Gonzalez told plaintiff that she should apply for other positions with upward mobility, Compl. ¶¶ 31–32; (2) plaintiff was not invited to the DHS Day conference or a congressional briefing, Compl. ¶¶ 84–88, 96–99; (3) plaintiff's top hiring choice was not selected, Compl. ¶ 91; and (4) Gonzalez emailed plaintiff with others on the chain stating, "Were you informed of this? Please advise." Compl. ¶¶ 128–29.

The Supreme Court has cautioned that federal employee discrimination statutes should not be used as "general civility code[s]" for unhappy employees. *Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998). Courts should not act as "super-personnel department[s] that reexamine[ ] an entity's business decisions." *Holcomb v. Powell*, 433 F.3d 889, 897 (D.C. Cir.

2006), quoting *Barbour v. Browner*, 181 F.3d 1342, 1346 (D.C. Cir. 1999).   As such, "purely subjective injuries," such as public humiliation or loss of reputation, are not adverse actions. *Holcomb*, 433 F.3d at 902; *see also Chambers*, 35 F.4th at 874 ("[N]ot everything that happens at the workplace affects an employee's 'terms, conditions, or privileges of employment[.]'").

Plaintiff's remaining allegations consist of nothing more than subjective injuries.   Although plaintiff might have been disappointed by some of defendant's decisions, such as not inviting her to events or hiring her favorite candidate, "not everything that makes an employee unhappy is an actionable adverse action."   *Russell v. Principi*, 257 F.3d 815, 818 (D.C. Cir. 2001).   These experiences do not demonstrate "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities."   *Forkkio*, 306 F.3d at 1131. Moreover, without more, it is unclear how a statement recommending that someone should apply for positions that afford opportunities for advancement is adverse, even if plaintiff perceived it as a slight.

Thus, defendant's motion to dismiss Counts I and II is granted as to all claims other than those based on the reassignment of responsibilities.

## II.    Some of plaintiff's retaliation claims in Count III survive.

Defendant argues that plaintiff's retaliation claims should be dismissed for the same reasons as her discrimination claims: (1) plaintiff failed to timely exhaust her administrative remedies, and (2) plaintiff has not alleged "adverse actions" in the retaliation context.   Def.'s Mot. at 12–13, 16–18.

Title VII's anti-retaliation provision makes it unlawful for "an employer [to] 'discriminat[e] against' an employee . . . because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."   *Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 56 (2006),

quoting 42 U.S.C. § 2000e–3(a).  The first clause, regarding employees who oppose a practice made unlawful by Title VII, is known as the opposition clause, while the second clause, regarding employees who participate in an EEO investigation, proceeding, or hearing is known as the participation clause.  *See Crawford v. Metro. Gov't of Nashville & Davidson Cnty., Tenn.*, 555 U.S. 271, 274 (2009).

In order to establish a prima facie case of retaliation, plaintiff "must show (1) she engaged in a statutorily protected activity; (2) she suffered an adverse employment action; and (3) there is a causal connection between the two." *Taylor*, 350 F.3d at 1292.  However, a "plaintiff alleging retaliation faces a low hurdle at the motion to dismiss stage." *Winston v. Clough*, 712 F. Supp. 2d 1, 11 (D.D.C. 2010).

The elements of a retaliation claim differ from what must be shown in support of a discrimination claim; while the causal connection must be stronger, the threshold for what constitutes an adverse action is somewhat lower.  While a plaintiff alleging discrimination need only show that the action was motivated to some extent by unlawful bias, *Burley v. Nat'l Passenger R.R. Corp.*, 801 F.3d 290, 297 (D.C. Cir. 2015), the Supreme Court has emphasized that "Title VII retaliation claims require proof that the desire to retaliate was the but-for cause of the challenged employment action." *Univ. of Texas Sw. Med. Ctr. v. Nassar*, 570 U.S. 338, 352 (2013).  Also, there is a more flexible standard for what constitutes an adverse action: employment actions in the retaliation context need only "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57.

Notwithstanding these differences, to be actionable, a workplace event must still have consequences:  "[w]e speak of *material* adversity because we believe it is important to separate

significant from trivial harms.  Title VII, we have said, does not set forth 'a general civility code for the American workplace.'"  *Burlington N.*, 548 U.S. at 68 (emphasis in original), quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 80 (1998).  The plaintiff still must suffer some objectively tangible harm.[14]  *Wiley v. Glassman*, 511 F.3d 151, 161 (D.C. Cir. 2007); *Forkkio*, 306 F.3d at 1130–32 (holding that the assignment of the plaintiff's supervisor "may have caused [plaintiff] subjective injury, but it did not objectively harm his working conditions or future employment prospects" to support a retaliation claim).

Plaintiff alleges that defendant retaliated against her after she "engaged in protected activity when she complained about discrimination," contacted the EEO counselor on November 4, 2019, and filed her EEO complaints.  Compl. ¶¶ 8, 151, 158; Pl.'s Opp. at 12.  In her opposition to defendant's motion to dismiss, plaintiff clarifies that the phrase "when she complained about discrimination" is meant to refer to her October 2018 attempts to schedule a meeting with Albence about the disappearance of the Chief of Staff position from the proposed organizational chart.  Pl.'s Opp. at 12; Compl. ¶¶ 25, 151.  Her opposition brief further clarifies which of the alleged adverse actions "should be regarded as ones that would dissuade a reasonable person from engaging in protected activity" to state a claim of retaliation.[15]  Pl.'s Opp. at 12–13.

---

14      In *Chambers,* the Court of Appeals held that retaliation claims still require an "objectively tangible harm," as the Supreme Court has concluded that in the retaliation context, "the standard for judging 'material adversity' must be objective, meaning it must be judged from the perspective of a reasonable employee."  *Chambers*, 35 F.4th at 876, citing *Burlington N.*, 548 U.S. at 68–69.

15      Plaintiff concedes that her claim "involving a co-worker comment on an email" should not "be regarded as one[ ] that would dissuade a reasonable person from engaging in protected activity" to establish retaliation.  Pl.'s Opp. at 13. Therefore, the Court will grant the motion to dismiss Count III to the extent it is premised on that communication.

Before assessing the sufficiency of the allegedly retaliatory adverse actions, the Court must first determine whether and when plaintiff engaged in protected activity.

### A.  The cancelled meeting with Deputy ICE Director Albence

Plaintiff contends that she engaged in protected activity when she attempted to report DAD Gonzalez's actions with respect to the organizational chart to the Acting Deputy Director of ICE in October 2018.  Compl. ¶ 25.  While she seems to argue that her actions fall under Title VII's opposition clause, plaintiff conflates an *attempt* at opposition with actual opposition.  Plaintiff's complaint alleges that she scheduled a "meeting to discuss th[e] topic," and that Albence's assistant called to ask plaintiff about the nature of the meeting.  Compl. ¶¶ 25–26.  Plaintiff responded simply that it "was a personal matter," and there is no allegation in the complaint that she conveyed any complaints about Gonzalez or discrimination to Albence.  Compl. ¶ 26.  Since the complaint does not contain facts to support a claim that plaintiff engaged in protected activity in October 2018 when she tried to meet with Albence, any claims that she was retaliated against between October 2018 and November 4, 2019 for that thwarted attempt must be dismissed.

### B.  Alleged retaliation following plaintiff's November 2019 EEO activity

Plaintiff's remaining five claims occurred after she contacted an EEO officer on November 4, 2019, Compl. ¶ 8, conduct clearly reflecting that she "made a charge" in a "proceeding" under Title VII to constitute protected activity.  § 2000e–3(a).  In her April 7, 2020 amended EEO complaint, plaintiff pointed to the following events or circumstances as retaliatory: (1) the DAD has "continually undermined [her] ability to perform her budget execution duties;" (2) the DAD failed to advertise the acting DAD position in December 2019; (3) on January 29, 2020, the DAD failed to provide plaintiff a reasonable amount of time to meet with her attorney regarding her EEO filing; (4) on March 12, 2020, the DAD re-assigned plaintiff's contracting duties to

28

Nicholson; and (5) on March 13, 2020, plaintiff received negative feedback in her mid-year performance review.  *See* DHS Amended Acceptance of Formal Complaint at 2.  Plaintiff filed the amended complaint within 180 days of the alleged retaliation and therefore pursued her administrative remedies in a timely fashion.  *See generally* 42 U.S.C. § 2000e–16; 29 C.F.R. § 1614.106(a).  The next questions to consider are whether plaintiff has alleged any adverse employment actions and if the facts support an inference that there is a causal connection between any adverse action and the protected activity.  *See Taylor*, 350 F.3d at 1292.

### 1.  Reassignment of plaintiff's duties

For the reasons previously discussed, the reassignment of plaintiff's duties can constitute an actionable adverse employment action.  Plaintiff claims that defendant undermined her budget duties beginning in November 2019 and re-assigned her contracting duties on March 12, 2020.  Compl. ¶¶ 109, 126.  Temporal proximity may support an inference of causation when the protected activity and challenged action are close in time.  *See Iyoha v. Architect of the Capitol*, 927 F.3d 561, 574 (D.C. Cir. 2019); *see also Hamilton v. Geithner*, 666 F.3d 1344, 1349 (D.C. Cir. 2012) (noting that "district courts in this circuit generally follow an informal 'three-month rule' for cases in which a plaintiff attempts to establish a prima facie case of retaliation based on temporal proximity alone").  Because these alleged adverse actions occurred less than three months after plaintiff contacted the EEO counselor on November 4, 2019, and filed the administrative complaint on January 31, 2019, the facts are sufficient to allege a causal connection between the protected activity and the changes in plaintiff's duties.  *See* Compl. ¶¶ 8, 10.

### 2.  Failure to provide time to meet with EEO attorney

Plaintiff complains that Gonzalez did not provide plaintiff with a sufficient number of hours of administrative leave to meet with an attorney regarding her EEO complaint:  she asked

for eight hours, and she received one and a half.  Compl. ¶¶ 122–24.  Whether this alleges an adverse action is a close question.

    "The scope of the antiretaliation provision extends beyond workplace-related or employment-related retaliatory acts and harm."  *Burlington N.*, 548 U.S. at 67; *see also Baloch*, 550 F.3d at 1198 n.4 (explaining that retaliation "encompass[es] a broader sweep of actions" than wrongful discrimination).  Adverse employment actions in the retaliation context need only "be harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  *Burlington N.*, 548 U.S. at 57.  The Court agrees that interfering with an employee's ability to consult with counsel concerning a pending EEO claim could fall within this category.  And plaintiff's request was denied less than two months after plaintiff first contacted the EEO.  But even taking the facts in the complaint as true, there is little information to go on.

    Plaintiff concedes that the amount of time defendant could provide was discretionary, but she asserts that the 1.5 hours was "simply not enough time to gather resources, travel to an attorney, meet with the attorney, and travel back."  Compl. ¶ 125. This is somewhat conclusory, but given the temporal proximity and the chilling impact this sort of restriction could have, the Court will permit the claim to move forward while the factual record is developed: what does plaintiff mean by time to gather resources?  Where did she have to travel?  How many hours of leave are typically granted for these purposes?  Under all of these circumstances, it will be more appropriate to consider this claim again at the summary judgment stage, but for now, the motion to dismiss Count III will be denied with respect to this aspect of the claim.

### 3.   Failure to advertise position and negative performance evaluation

    While plaintiff faces a lower hurdle for alleging retaliation, her allegations that defendant failed to advertise an acting DAD position in December 2019 – assessed separately from the failure

to advertise the Supervisory Community Relations Officer position – do not support a claim of retaliation after her protected EEO activity.  Most importantly, as previously discussed, plaintiff has not alleged that the acting DAD position continued to exist as of December 2019 so that a posting would even be required.  Rather, she concedes that "[i]t is possible that this posting never occurred because, as mentioned before, the DAD position Nicholson held technically did not even exist for someone to be promoted to." Compl. ¶ 121(a).  To the extent plaintiff argues she suffered a non-promotion, such a non-promotion requires that she "*applied* for and was qualified for an *available* position." *Lathram*, 336 F.3d at 1088 (emphasis added).  The stated concern that the agency failed to advertise a particular position in December 2019 does not allege either, and it cannot support a retaliation claim.

Similarly, as was the case with the discrimination claim, the negative feedback and comments received during the March 2020 mid-year review do not rise to the level of an adverse action.  The March 2020 evaluation did not have "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio*, 306 F.3d at 1131.  Plaintiff's allegations that defendant asked her to provide after-action emails and reminded her of the telework policy would not "dissuade a reasonable worker from making or supporting a charge of discrimination." *Burlington N.*, 548 U.S. at 57.

Plaintiff has stated a claim for retaliation based on the reassignment of her duties and the failure to provide the necessary amount of time for her to meet with her EEO attorney.  Defendant's motion to dismiss Count III is granted as to the remainder of her claims.

### III.   Plaintiff's hostile work environment claims in Count V fail.

Defendant argues that plaintiff's hostile work environment claims in Count V should be dismissed for failure to state a claim.  Def.'s Mot. at 18.  While defendant's motion to dismiss argued that any claims arising before September 20, 2019 or not raised in plaintiff's EEO complaint should be dismissed for failure to exhaust her administrative remedies, it concedes that the continuing violation theory under *Morgan* applies to plaintiff's hostile work environment claims.  Def.'s Reply at 3.

Under the "continuing violations" doctrine, "consideration of the entire scope of a hostile work environment claim, including behavior alleged outside the statutory time period, is permissible for the purposes of assessing liability, so long as an act contributing to that hostile environment takes place within the statutory time period." *Morgan*, 536 U.S. at 105.  However, "this doctrine should not be interpreted as an 'open sesame to recovery for time-barred violations' . . . [i]nstead, the plaintiff must show that the time-barred incidents are 'adequately linked into a coherent hostile environment claim.'" *Craig v. Dist. of Columbia*, 881 F. Supp. 2d 26, 32 (D.D.C. 2012), quoting *Baird v. Gotbaum,* 662 F.3d 1246, 1251 (D.C. Cir. 2011).  Thus, to evaluate the timeliness of the hostile work environment claim, the Court must first assess whether the claim includes actionable allegations and when they occurred.

A hostile work environment exists when an employer subjects an employee to "discriminatory intimidation, ridicule, and insult" that is "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal citations omitted).  To survive a motion to dismiss, plaintiff must allege facts showing that she subjectively perceived the environment as hostile, as well as facts showing that the environment is one "that a reasonable person would find

hostile or abusive."  *Id.*  To determine whether the objective standard has been met, courts must consider the "totality of the circumstances, including the frequency of the discriminatory conduct, its severity, its offensiveness, and whether it interferes with an employee's work performance." *Baloch*, 550 F.3d at 1201; *see also Allen v. Napolitano*, 774 F. Supp. 2d 186, 205–206 (D.D.C. 2011), citing *Holbrook v. Reno*, 196 F.3d 255, 262–63 (D.C. Cir. 1999) (explaining that defendant's behavior must severely or pervasively alter and interfere with plaintiff's employment).

Plaintiff's hostile work environment claim under Title VII is based on the adverse actions forming her discrimination and retaliation claims, including the removal of the proposed Chief of Staff position, non-selection and failure to promote the new supervisory position, reassignment of plaintiff's responsibilities, and negative performance reviews.  Her claim satisfies the subjective prong of the test because she states that defendant's conduct was "unwelcome" and caused her to suffer "economic losses, economic distress, humiliation, shame, and embarrassment." Compl. ¶¶ 165, 169–174.

But, the totality of circumstances surrounding plaintiff's allegations do not satisfy the objective component of a hostile work environment claim.  Although plaintiff has alleged a range of actions that occurred since 2018, the acts were not frequent, and rather occurred over an extended period of time.  *See Laughlin v. Holder*, 923 F. Supp. 2d 204, 220 (D.D.C. 2013) (determining that the alleged conduct was not 'sufficiently severe or pervasive' to state a plausible hostile work environment claim when the acts spanned a period of several years and were "relatively infrequent") (internal citations omitted); *Nurriddin v. Bolden*, 674 F. Supp. 2d 64, 94 (D.D.C. 2009) (finding alleged events were "temporally diffuse, spread out over a four-year period, suggesting a lack of pervasiveness" that did not support a hostile work environment claim). Moreover, even though plaintiff experienced several incidents when she was treated unfairly in

her view, and she attributes those events to discrimination based on her gender or race or both, plaintiff has not alleged any facts that connect any of the actions taken to her membership in a protected class:  nothing demeaning toward plaintiff as a woman or a woman of color was alleged to have been said at any time.  Given the lack of such allegations and the sporadic nature of the events of concern, the complaint falls far short of the required severity or offensiveness of the hostile work environment standard.

"These standards for judging hostility are sufficiently demanding to ensure that Title VII does not become a 'general civility code.'" *Faragher*, 524 U.S. at 788.  While plaintiff might have suffered discrete instances of discrimination or retaliation, these actions are not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21 (internal citations omitted).  Whether or not the acts that took place outside of the statutory time period are time-barred is irrelevant because plaintiff failed to state a hostile work environment claim at all.  Defendant's motion to dismiss is therefore granted as to Count V.

## CONCLUSION

For the foregoing reasons, the Court will **GRANT** defendant's motion to dismiss [Dkt. # 13] as to Count V.  The motion will be **GRANTED** in part and **DENIED** in part as to Counts I, II, and III.

**SO ORDERED.**

AMY BERMAN JACKSON
United States District Judge

DATE:  May 2, 2023